The first case on the calendar is Zeng v. New York City Housing Authority, and we have Mr. McCallion for the appellant. You can proceed whenever you're ready. May it please the court. The lower court's grant of summary judgment should be reversed, and the record we believe strongly suggests this, based on the fact that there are numerous disputed issues of material fact. Which cannot and should not have been resolved by a court, but could only be resolved by a jury. Now, the record reflects, and it's not in dispute, that Ms. Zeng, the plaintiff in this case, was a petite Asian-American single mom with limited English ability, and she was trying to make a living for herself and her son under extremely difficult circumstances, apart from the abuse and discrimination which she was subjected to. She had been subjected to domestic abuse, and she was in a heated, contested proceeding in family court for custody of her son, as well as hearings relating to restraining orders relating to her abusive partner. Life was challenging enough for her, however, the record is also clear that she was subjected at her job at the New York City Housing Authority to violent, abusive discrimination, both in words and actions. So violent. I'm sorry, you said violent? I'm sorry, vile. Okay. Also violent. She was sexually assaulted. Right. Well, that's not one of the causes of action you're bringing against these defendants, correct? Correct. However, she asked to be moved from the LaGuardia houses, her first stop, because she was subjected to a sexual assault. So that's part of your hostile work environment claim. Sexual assault, yes. That's part of your hostile work environment claim. That's not a separate cause of action, but you're alleging that's part of the hostile work environment, that she asked to be put with someone else while she was working, that was denied, and then there was this assault by an individual in the building, right? Absolutely, and she was not moved to another work environment, another set of housing, until after she saw the assailant really a second time. Did the district court consider that as part of the hostile work environment when it analyzed it? I didn't see that. It said, I think the district court said there were four comments and didn't look at that issue as part of the hostile work environment. Am I right about that? You are correct, and it should have. And you mentioned the four comments. I think that goes to the heart of why reversal is necessary, because in each instance, the district court found inferences and reached conclusions which were asserted by the defendant, but not those of the plaintiff. For example, a coworker of the plaintiff, Ms. Slim, it's alleged that every time that the plaintiff saw this particular coworker who added in for her, and the plaintiff was perhaps a target for this, being the only Asian-American working there. I'm sorry, can I just jump in for a second? Sure. There's an allegation in the complaint that every time she encountered this individual, she engaged in slurs, is that what you just said? Absolutely, and yet the court counted this as one incident. The incidents which were identified were exemplative. And also the Mr. Ramos going into the women's bathroom, she said occurred multiple times as well, right? Absolutely. Did the district court analyze that? The district court really didn't go into that. It did mention in passing that there was that allegation. However, the barging in on it repeatedly was not mentioned by the court, although it was asserted by the plaintiff. Let me ask you a question about the, I know you're focusing on the hostile work environment, but the discrimination claim, the city's argument here is that, I think primary argument is that the person who made the decision, Ms. Bellini, was not one of the individuals who your client alleged harbored this racial animus. You know, there were incidents involving Ramos, there was the email from Medina. Exactly. But Bellini wasn't alleged, I don't think, to have made any comments or sent any emails. So what's your response to that? And that's an unfair finding in the record. For example, Bellini, there was one instance where four supervisors were either present or on the phone because they were all discussing this problem woman, the plaintiff, Ms. Zeng. And they used vile language, anti-Asian, basically screaming on the phone that she could overhear this conversation. And Bellini was one of the supervisors at her final stop, the Smith Houses. She was property manager. And Bellini was the one who had this conversation with one of the other supervisors that, oh, she says she has cramps, she says she's sick, but we all know it's Chinese New Year. And on Chinese New Year, you know, Chinese people like to go out and set off fireworks. Leaving aside the fact it wasn't Chinese New Year, but Bellini was in on, you know, the sick joke which the supervisors had. Bellini also waited 77 days from the time that a decision was made in February of 2017 to discharge her until May when she was discharged. And during that period of time, they papered the file to this plaintiff with all kinds of complaints so it looked like they're saying during that period they were trying to find another place for her to work that would be acceptable. Isn't there support in the record that they were trying to find another house that she could work at? And they say she refused. They offered her other positions and she refused. Is that not true? That is disputed. Her position was that she was actually content to stay where she was if, in fact, the discrimination and the vile comments ceased. Perhaps the most important, I'll call it a smoking gun, which we have here, of why reversal is necessary, is that the court found there's insufficient evidence that there was a denial of her request for leave to attend court, see her lawyer, and so forth for these legal matters. She was embroiled in. She says that on one occasion or more, she was denied the form. They say in a deposition, well, you know, the forms are on the desk there. She could have walked in any time. What the court below ignored or perhaps it didn't hear it was a tape recording, which we've highlighted in our brief. It was a consensual recording in the sense that the supervisor knew that he was being recorded by her. It was in the record below. And we hear this confrontation where he's saying, no, you're not going to get a leave form. Wait, that's not quite correct. In fact, what he actually says is, I've given you the form, essentially. I'm not giving you another form. There's nothing there. I don't, you know. You're not getting, well. But there is, in that conversation, he does say that he has already given her a form, doesn't he? No. He's saying no form. You show up for work tomorrow. I'm, what he says is, this is the only piece of paper I'm giving you. She says it was a blank piece of paper. The other side never argues on appeal, something it never argued below, which is that, oh, here, take this blank piece of paper. Wasn't a blank piece of paper, but was a form she was being handed. Well, we don't, I mean, I'm sorry. There's nothing in the record to indicate one way or the other whether or not the form is blank. I understand that's your position. But what the recording does indicate is that she is being given a form. So for you to rely on that recording as, well, here's proof they wouldn't give her the leave form because what they're saying in the phone conversation, it wasn't actually the leave form. I mean, that's, that's not a basis. I mean, that's, that's not a basis for us to find that, that that's what happened. Well, you have a disputed issue of a fact. She was there. So she has to record it. It's disputed whether there was a blank form or was an actual form. That's disputed, you're saying. Oh, absolutely. And it was never argued in the court below. There's nothing in the record where this, the city housing took the position that she was being handed a form. And there's no discussion by the court's decision below that it ever even listened to this. All right, I understand your position. Before you sit down, I know you have two, three minutes for rebuttal. But you're not pursuing the claim that her status as a single parent or as a victim of domestic violence is some separate cause of action under Section 1981 or Title VII. You're not pursuing that on appeal, right? Your, your, your base, your basis is based upon her gender and her race, race and ethnicity. Am I accurate in that? Yeah, yes, absolutely. A hostile work environment. Retaliation on the firing. Right, but not based upon her status as a single parent or as a victim of domestic violence, right? Correct. Not on her familial status. And they get, they go into the issue of, oh, F your son. Oh, that, that, that's not, that's not covered by the federal statutes because that's familial association. But F your son could just as easily be considered gender discrimination against her. We understand your argument. Thank you. All right, we have Ms. Lee who is remote. Can you hear us okay? Yes, I can. Can you hear me, Your Honor? Yes, perfectly. So you can begin whenever you're ready. Good morning. Yes, before I begin, I just wanted to apologize to the court for not being able to appear in person today. And to thank the court again for giving me an opportunity to argue this case remotely on a very short notice. So I very much appreciate your understanding. Are you feeling, are you feeling all right? I'm hanging in there, Your Honor. Thank you. I took a lot of time out this morning, so I'm okay for this morning, hopefully. But, but thank you again for your understanding. I really appreciate it. With respect to this case, so I, I just want to address a number of things about the record that counsel just raised that are not accurate. But just as my introduction, to defeat semi-judgment here, appellant Ms. Zeng was required to adduce sufficient evidence to support a rational finding that NYCHA's reasons for terminating her, the reasons that we've offered, are false. And that discrimination was more likely than not the reason for her actual termination. As the district court held, she failed to meet this burden. She did not adduce any evidence, let alone sufficient evidence, to support such finding. And instead, she relied primarily on various conjectures, speculations, and even conspiracy theories, all of which are insufficient to defeat semi-judgment as a matter of law. She also on appeal maintains that there are various issues of facts that preclude semi-judgment at this point. But however, the factual contentions that she relies on are either not material, or they are not supported in many instances, flatly refuted by the record. I will start with counsel's point about the transfer, or NYCHA's refusal to transfer her when she had the encounter with the perpetrator. So, the first time she saw the perpetrator, this person who exposed himself to her, was September. Actually, her supervisor immediately asked her if she wanted to be reassigned. She declined that, and nevertheless, her supervisor assigned her to a different building. Wait, wait, wait. Hold on, Ms. Lee. She says she requested in July that she be placed with another worker, and that that was denied. And as a result of that, this incident happened. And I think that's disputed. That's a disputed fact, right? She was the only worker who didn't get paired with somebody else in a dangerous building. She requested in July to get paired with someone else. Nothing happened, and then this incident happened in September. I think that's her position, right? Yes, Your Honor. Her position is that she was assigned to this building, 300 Cherry Street, which she claims to be a known dangerous building. There's no evidence in the record to support that it was. And she claims that she was single out to work as the only caretaker of that building. No, you're saying there's no evidence in the record to support it. We have to take her version of the facts as true. She says that it was a known dangerous building, that she was the only one who didn't get paired up with somebody for some unknown reason. I know they say that's not true. People just are with each other for a short period of time when they start. But all those things are disputed. And I think that is part of a hostile work environment claim. If a female employee says, this is a dangerous building, I need to be paired up, and it's denied. And then there's an incident like this, where she says this man exposed himself and touched her. That certainly can be part of a hostile work environment, right? Your Honor, and then there are actually further events right after that, right? So what I was trying to explain is that when she first saw that perpetrator, she actually didn't want to transfer. And NYCHA reassigned her to a different building over her objection because of her safety concerns. That's true. But then at the different building, she says Mr. Ramos, her supervisor, made these vile remarks about her ethnicity at a meeting on December 23rd with other individuals there. That's part of her hostile work environment claim. She claims he came in multiple times into the bathroom, intentionally yelling at her, accusing her of hiding in the bathroom. That's part of her hostile work environment claim. She says a co-worker made all these comments about her being Asian multiple times every time she saw her. That was part of her claim. So these things all happened in a very short period of time. I think like a four-month period that she alleges all these things happened. So if all those things are true, couldn't a rational jury find if all those things happen, that that's a hostile work environment? I think, Your Honor, her theory of the case relies on this continuum of racial animosity, that she was assigned to this building, and she was there, and she asked to be transferred. NYCHA refused and kept her there. That is not true. NYCHA moved her twice. The bathroom incident, there's actually in her own deposition testimony, she admits that there were other women in the bathroom. So the supervisor, though it's an inappropriate incident, he did it. When you say incident, she said it happened multiple times. She said, I look back, she said multiple times he did that to her, not one time. Her supervisor. That is disputed, Your Honor. But I guess what I was trying to explain is that she also admitted that there were other women in the bathroom. He was looking for her because she failed her court probation for not being at her assigned location. I don't understand that argument. Does that make it better that there were other women in the bathroom? That you have a male supervisor going into a woman's bathroom, yelling at her, accusing her of not doing her work? No, I absolutely agree there was an inappropriate incident. What I was trying to explain is that because there were other women in the bathroom, he wasn't doing to her on the basis of her gender. He wasn't treating her just differently. He was looking for her. And I agree again, it's an inappropriate incident. He was looking for her because she had a history of not being at the location she's supposed to be. I know the district court didn't even consider that. The district court didn't even consider that. In analyzing the house and work environment, didn't even mention the bathroom incidents at all. It mentioned it in the facts section, but just said there were four comments and that's not enough. But in reality, there was much more than that alleged. Your Honor, so with respect to the four comments, actually it was Ms. Vang who in her opposition to NYCHA's summary judgment, she admitted that her hostile work environment claim was based on the five statements. So that wasn't the court, I mean, there was a court analysis, but she conceded that point in her opposition. So it wasn't that the court ignored other things, that was her argument that the hostile work environment claim was based on the four or five statements. Well, I've read her declaration. Her declaration mentions much more than that. I don't know what you're referring to in the deposition. Do you have the page number of that? No, no, I meant her opposition to NYCHA's summary judgment papers, yes. All right. Let me ask you about the discrimination claim, because their argument on that is, I mentioned that Ms. Bellini was the one who wrote the memo asking for her to be terminated, but their argument is that there was six counseling memoranda written up, including a number by this individual Ramos, who she claims was filled with discriminatory animus for the reasons that we discussed. So why doesn't that create, she obviously disputes that she was a bad worker. The district court said, well, just disputing whether or not you're a bad worker doesn't show it was discriminatory, but she's alleging that Mr. Ramos, who wrote these memos, harbored this discriminatory intent. And in fact, she says she overheard this conversation when she got transferred to Smith House of him referring to her in derogatory ethnic terms, telling her new supervisor, Medina, to write her up. So again, if all of that is true, if you have this individual harboring and stating this discriminatory animus tells the new supervisor, if she gets transferred, to write her up, she shouldn't have been transferred, and then there's right away three counseling memos, and then including the one by Bellini, why isn't that a potential inference of discriminatory intent? So with respect to that phone call, your Honor, Ms. Bellini was not present. That's not accurate about what counsel represented to the court. Ms. Bellini was not there. None of the three other supervisors from Smith Houses were there. None of them said anything and anything inappropriate. Her allegation is only that it was Mr. Ramos. Even if they weren't there, though, if some of the memos were written by Mr. Ramos that were relied upon for her termination, I know in your papers you suggest that Ms. Bellini based it only upon her observations and her own memo, but her memo actually says repeated write-ups. I don't have the exact words, but she's clearly relying on, and the district court said six memos. The district court clearly was of the view that the city considered all of the conduct, including that had been written up by this supervisor Ramos, who she says did all these terrible things related to her ethnicity. So she received three counseling memos at Smith Houses. The record is very clear that when Ms. Bellini requested termination, she relied on those three memos. She also discussed that the reason she was requesting termination is because Ms. Tseng essentially refused to do her job during the two months she was at Smith Houses. Whatever assignments the supervisors gave her, she refused to do them, and Ms. Bellini explained in her termination request that that had a very bad impact. Where did Ms. Bellini say she was only relying on her own memo and her own observation in requesting termination? The memo that I read, which is Appendix 222, says due to repeated memo issuance, repeated, and she only issued one. No, Ms. Tseng received three counseling memos at Smith Houses, Your Honor. So Ms. Bellini issued one, and the other two supervisors at Smith Houses issued two others. In total, she had three at Smith Houses, and Ms. Bellini relied on those three. When did she say that? When did she say it's only those three, not the three from earlier? I didn't see that anywhere in the record. She said, I'm sorry, I don't have the termination request right in front of me. I just read it. She said repeated memo issuance. So I don't know if that's three. I don't know if that's six. I will also jump to just quickly the 77 days that counsel referred to, because the termination, ultimately when Ms. Tseng was terminated, it wasn't solely because of the termination request by Ms. Bellini. It was the fact that for three months between February and May, NYCHA's HR worked with her to find an alternative safe location for her to transfer, that the HR offered her multiple transfer opportunities, three, in fact. She refused them all. She rejected them without explaining why they were not sufficient. And she ceased communication. And it was only then that HR then processed the termination request. It was just put in by Ms. Bellini back in February and terminated her employment. But any claim that this was a pattern of continual racial animus against her the entire time she's there, there's a lot of evidence in record, Your Honor, refuting that. Including those months when NYCHA worked with her to find a location that would work for her. Let me ask, I have two other questions. One, the district court said it's implausible to allege that you wanted to be paired with someone and when it was denied, while at the same time alleging that these racist comments occurred. If you weren't paired with anybody, the district court used the word, it's implausible. Isn't that a credibility determination? Isn't the district judge basically saying, and I'm not sure that those are mutually exclusive, you could obviously be working alone as you clean classrooms or whatever and still be with other people during breaks and other parts of the day, right? Is that implausible? No, I agree with you, Your Honor, that I think that you're right. You can work alone and still see other co-workers, right? Run into them during lunch or a bathroom break. So you can see them and you can potentially hear, right? Wasn't that the district court making a credibility determination? I don't think that that particular sentence and that particular analysis was the basis for the court decision. There's a lot in the record. The court analyzed a lot of statements, a lot of incidents. The court went through and addressed how a lot of her allegations were refuted by the record or not supported. For example, her leave of absence request, her claim, one of her claims was that she was not permitted to take time off and she missed a lot of court appearances. She lost an order of protection. Those were things that she had evidence, she should have evidence to support though, but she did not submit anything, any court docket, any court orders to show that that actually happened. So I don't think that one sentence is the basis of the district court's decision. On the retaliation claim, the district court noted that some of her oral complaints were uncorroborated or undocumented, but there was this email March 15th that was in the record from Mr. Chadoff to Altman that says, quote, I thought I had deleted the bulk of the questionable comments from the email chain. This was written to the assistant director of human resources, Altman. Can you explain that email? I don't really, obviously it seems like there was some type of deletion related to Ms. Zhang's complaints or comments. I'm not sure exactly what it referred to, but was there any discussion in the depositions about what that meant? I don't believe there were any discussion about that particular email, Your Honor. Doesn't that sound bad? Well, so with respect to the retaliation claim, there is no dispute that she'd made a complaint to HR in March of 2017 and then she filed four more DO complaints. We're not disputing that. I know, but she's alleging she made the complaints orally in December and that's when the write-ups began in January, which is a much closer time period to when she claims that these other things started happening to her and there's this inexplicable email about the deleting of questionable comments. So with respect to the December complaints, if the December is the perfect activity, then the termination is actually made, Your Honor. The issuance of a counting memorandum in January itself is not an adverse employment action. So the temporary proximity we're looking at is between the perfect activity, whether it's December or March of 2017. Ms. Bellini's memo recommending termination was on February 6th. That's very close to where she says she started complaining orally, right? And again, NYCHA did not process that termination request until May because of all the intervening events. And actually, I just wanted to quickly note, counsel said that actually she didn't, she disputes the 77-day delay. That is not accurate. She actually admitted this is a counter-segmental fact. It is undisputed that HR worked, during those three months, HR worked with her to find an alternative safe location. All right. Thank you very much, Ms. Lee. Thank you very much for your time, Your Honor. And we appreciate you making yourself available even though you're not feeling well. No, I appreciate you understand. I realize it was a short notice, so I very much appreciate your understanding. All right. Thank you very much, Your Honor. Mr. McCallion, you have three minutes in rebuttal. Thank you. I'd like to emphasize that many of the discriminatory comments, vile and outrageous statements made to her, threatening and extremely offensive, were made by supervisors. In fact, generally by her supervisors. And I think that should be taken into account and would be taken into an account if a jury was permitted to hear the case. On the issue of the tape, for the first time on appeal, the city housing has taken the position, well, you know, in this tape, the paper that he was trying to give her was a particular form. They didn't argue that before. But I just went over the transcript, and I'll defer to the court can listen to the tape. But we attempted to accurately transcribe on page 24 and 25 of our brief. And it clearly says that she is reaching, I need one of those forms, reaching for a form on the desk. No, no, no. I can't give you that. I can't give you that. Be here tomorrow. I ain't giving you nothing. That's the only paper I'm giving you. That's it. And according to her, it was a blank piece of paper. In any event, she does not have leave request forms stamped denied because in her theory of the case, we think supported by the tape, she was denied actual access on numerous occasions to the actual forms. The winter coat issue, I think, is another issue where the court, there's a disconnect between the court's conclusion that she wasn't denied a winter coat at LaGuardia houses because she left LaGuardia houses on November 21st when it was 34 degrees, but she didn't have a coat. Her claim was not that she was denied a coat at LaGuardia houses in winter. Her claim was that she was denied it on a cold November, rainy and cold. I could just ask you, on the retaliation claim, your adversary raises the issue of the timing between the protected activity and when she was ultimately terminated. Could you speak to that? I know it came up previously. Judge Bianco raised the concern about what they were complaints made in December. She's ultimately terminated, I guess, in May. What are we to make of the lag between the protected activity and the alleged retaliation? According to plaintiff, and I think the record bears it out, she started making these complaints. They weren't reported up the ladder to equal opportunity. In fact, they say they don't have a record of many of these complaints and that the management basically engaged in a three-month campaign, conspiracy if you were, would to paper the record with disciplinary issues of a semi-frivolous nature. For example, she didn't have keys for 30 minutes. But doesn't the record during that time also support, in fact, that they were making efforts to accommodate her transfer request during that period? You're not in to work with her during that period from, I guess, January to February, I guess, January till when she was terminated. Does the record also indicate that, aside from the, as you characterize it, papering the record, that there were actually documented efforts as well with regard to her request to transfer? Well, that's why we have horse races and trials. It's a disputed issue of fact. She says no. They papered the record to look like they were counseling her and giving her an opportunity to go elsewhere. But in fact, she continued to be exposed to the same vile and abusive treatment at Smith House, which she had been subjected to before. Two prior transfers didn't change the playing field as to how she was abused in the system. And another change would not have changed anything, in her view, because all the supervisors, they spoke on the phone each other. She was somewhat of a celebrity in the housing authority because they called her treatment insubordination when, in her view, she was merely pushing back and complaining, but those complaints were not forwarded up the ladder. I'm not sure I answered properly. All right. Thank you very much. Thank you both. We'll reserve decision. Have a good day. Thank you.